**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| ALL MUSLIM ASSOCIATION OF AMERICA, INC. | Civil Action No. 1:20-CV-00638 |
| *Plaintiff,* | |
| v. | **COMPLAINT** |
| STAFFORD COUNTY, VIRGINIA and STAFFORD COUNTY BOARD OF SUPERVISORS, | |
| *Defendants.* | |

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

JURISDICTION AND VENUE .......................................................................... 4

THE PARTIES AND RELATED ACTORS........................................................ 4

FACTS ................................................................................................................ 5

    I.     LEGAL FRAMEWORK FOR THE ORDINANCE ............................. 5

         A.    Relevant Provisions of the Code of Virginia ............................... 5

         B.    The Ordinance............................................................................. 6

         C.    Stafford County's Interpretation of "Churchyard" ..................... 7

    II.    AMAA'S RELIGIOUS MANDATE AND NEEDS .............................. 9

         A.    AMAA Requires a Cemetery for Muslim Burials ....................... 9

         B.    AMAA Purchases the Property with the Reasonable Expectation of Developing a Cemetery............................................................ 11

    III.   THE COUNTY RESPONDS TO AMAA'S EFFORTS TO DEVELOP A MUSLIM CEMETERY ON THE PROPERTY ..................................... 12

         A.    Community Member Complains of AMAA's Proposed Cemetery.......... 12

         B.    County Staff Prepares an Initial Draft of the Ordinance........................... 14

         C.    Planning Commission Cemetery Subcommittee Creates the Ordinance .. 16

         D.    Planning Commission Recommends that the Board Adopt the Ordinance ................................................................................. 18

         E.    Board Hearing to Adopt the Ordinance .................................... 19

    IV.   UNAWARE OF THE NEW ORDINANCE, AMAA ATTEMPTS TO BEGIN CEMETERY DEVELOPMENT ........................................................ 21

         A.    AMAA Seeks Reconsideration of the Ordinance ..................... 22

         B.    Planning Commission Recommends Affirming the Ordinance................ 23

         C.    Board of Supervisors Votes to Keep the Ordinance ................................. 24

    V.    COUNTY DENIES AMAA'S REQUEST FOR A VARIANCE......................... 27

    VI.   THE COUNTY TREATS CHRISTIAN ORGANIZATIONS MORE FAVORABLY ................................................................................. 31

CAUSES OF ACTION....................................................................................... 31

PRAYER FOR RELIEF ..................................................................................... 42

The All Muslim Association of America, Inc. ("AMAA" or "Plaintiff"), through its attorneys, hereby alleges as follows:

## INTRODUCTION

1.      This action arises from the unlawful adoption by Stafford County, Virginia (the "County"), acting through its Board of Supervisors (the "Board" and together with the County, "Defendants"), of an ordinance (the "Ordinance") designed to preclude a Muslim association from building a cemetery on land zoned for that purpose. The Ordinance is discriminatory, arbitrary, and imposes a substantial and impermissible burden on the exercise of religious freedom in violation of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), the United States and Virginia Constitutions, and Virginia's Dillon Rule.

2.      Plaintiff AMAA is a nonprofit religious organization that provides low-cost burials consistent with Islamic religious beliefs. AMAA purchased land at 1508 Garrisonville Road in Stafford County (the "Property") after inquiring and receiving confirmation from the County that the Property was zoned for cemetery use by right, as remains the case today. As such, in purchasing the Property, AMAA had the reasonable expectation of developing a cemetery to carry out burials in accordance with its Islamic faith.

3.      In June 2016, a County resident living nearby the Property learned of AMAA's intentions and wrote to the County, ostensibly expressing concerns about the proposed cemetery's potential impact on his private well water supply. The resident's private well is at least 200 feet from the proposed cemetery.

4.      The County agreed to investigate the issue. Almost immediately, County officials were informed by the Virginia Department of Health (the "Health Department") that the proposed cemetery, if separated from the private well by at least 100 feet, would pose no harm or

public health concern.  The County also was informed that the Code of Virginia's cemetery provision does not include any separation requirements between cemeteries and private wells or perennial streams.

5.      County officials, however, refused to heed this guidance.  Instead, in response to learning of AMAA's intention to build a Muslim cemetery, they embarked on a campaign to change the law to prevent its development.  The campaign was spearheaded by current Supervisor and then County Planning Commissioner Crystal Vanuch, notwithstanding the conflict of interest presented by the fact that her home and farm are located across the street from the Property.

6.      In a rushed and unusual process that a County Supervisor described as "totally out of the normal order," the County adopted the new cemetery Ordinance.  The Ordinance imposes excessive setback requirements that prohibit a cemetery from being built within 900 feet of a private well, perennial stream that flows into a terminal reservoir or a terminal reservoir.  Notably, this setback requirement far exceeds the Code of Virginia and was unsupported by any scientific analysis or study by the County, including as to why the Health Department's guidance should be ignored.  By design, the Ordinance precludes AMAA from developing a cemetery on the Property.

7.      The County's actions are not without precedent.  In August 2015, Stafford County foreclosed another Muslim group's efforts to build a cemetery by subjecting it to a then-existing size requirement *not* applicable to so-called "churchyard" cemeteries.  That group notified the County that the Islamic faith does not permit cemeteries to be co-located with a mosque, but the County stood firm in its refusal to treat the cemetery as a churchyard and that cemetery was

never developed.  By contrast, as described below, the County has on numerous occasions relaxed requirements to favor the interests of Christian groups.

8.     This discriminatory dynamic is reflected in the Ordinance itself, which further imposes on AMAA's religious cemetery— but ***not*** on "churchyard" or private family cemeteries— size requirements and a zoning reclassification application process that can include public hearings, specialized neighbor notifications, and board-imposed conditions on any permitted cemetery (the "Authorization Process").  In developing and passing the Ordinance, the County knew that AMAA's cemetery could not be co-located with a mosque and thus would not qualify for the "churchyard" exemption from the burdensome new requirements.

9.     The pretext offered by the County for the Ordinance is water safety.  But, tellingly, the County has taken no parallel action to increase distances between private wells (or perennial streams) and other potential sources of contamination, including septic tanks, sewage drainfields, farms and hog lots.  In fact, the County eased restrictions in its onsite sewage disposal ordinance around the same time it adopted the cemetery Ordinance.  Moreover, County records reveal that groundwater safety concerns were not raised or considered in prior changes to ordinances governing development of land near cemeteries.  Yet, without any sound basis or independent scientific analysis, in passing the Ordinance the County disregarded (i) the Health Department's professional opinion that AMAA's cemetery presented no water safety concern; (ii) the similar opinion provided by an expert site evaluator as part of AMAA's variance application; and (iii) the initial proposal by County staff, which observed that a 100-foot setback was sufficient.  The County, in adopting the setbacks, also failed to acknowledge that water flowing into a terminal reservoir is treated for water quality purposes.

10.     The Ordinance is unlawful, arbitrary and imposes a discriminatory and substantial burden on AMAA's fundamental right to exercise its religious freedom.  As AMAA's current cemetery nears capacity, it is unable to establish a new burial space for the Muslim community.  AMAA thus is forced to bring this lawsuit to carry out its essential service:  to bury deceased Muslims according to their religious beliefs, just like other religious groups in Stafford County.

## JURISDICTION AND VENUE

11.     Plaintiff's federal claims arise under the United State Constitution, the Constitution of the Commonwealth of Virginia, and 42 U.S.C. §§ 1983, 1988 and 2000cc.  This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1367.

12.     Venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to this action occurred in the Eastern District of Virginia.

## THE PARTIES AND RELATED ACTORS

13.     Plaintiff AMAA is a registered 501(c)(3) nonprofit organization established under Virginia law.  AMAA was founded in 1989 by a group of Muslims residing in the Washington, D.C., Virginia, and Maryland area to provide low-cost funeral and burial services in accordance with Islamic religious beliefs.  AMAA board members receive no salary for their work and rely on donations to support their efforts.  AMAA owns the Property at issue, identified in County tax maps by identification number 19-3E.

14.     Defendant Stafford County is located in the Commonwealth of Virginia.  The County constitutes a government for purposes of RLUIPA, 42 U.S.C. § 2000cc-5(4)(A).  The County has the authority to regulate and restrict the use of land and structures within its borders to the extent consistent with the Code of Virginia.

15.     The County's authority is limited to that expressly provided by the Commonwealth of Virginia.

16.     Pursuant to Code of Virginia Section 15.2-403, Stafford County is governed by and acts through Defendant Stafford County Board of Supervisors, which enacts laws, sets policies, and appoints members to County boards, commissions and committees, and is responsible for the acts and omissions of its agents and agencies.

17.     The Stafford County Planning Commission (the "Planning Commission") is appointed by the Board as required by Code of Virginia Section 15.2-2201.  The Planning Commission is responsible for reviewing the County's subdivision and zoning ordinances and rezoning and conditional use permits.  Pursuant to the Code of Virginia, the Planning Commission serves in a primarily advisory capacity to the governing bodies.

## FACTS

### I.     LEGAL FRAMEWORK FOR THE ORDINANCE

#### A.     Relevant Provisions of the Code of Virginia

18.     The Code of Virginia provides in relevant part, at Title 57, Chapter 3, Section 57-26, that

> No cemetery shall be hereafter established within a county . . . unless authorized by appropriate ordinance subject to any zoning ordinance duly adopted by the governing body of such county . . . ; provided that authorization by county ordinance shall not be required for internment of the dead in any churchyard . . . .

19.     Thus, the Code of Virginia provides that "churchyard" cemeteries shall be exempted from an ordinance approval process.

20.     Section 57-26 provides no definition of the term "churchyard" and nothing in the law requires that cemeteries must literally be adjacent to a church or house of worship to qualify as a "churchyard."

21.     The Code of Virginia also prohibits cemeteries, other than municipal cemeteries, from being established within 300 yards of a public wells.  Code of Virginia section 57-26, regulating the location of cemeteries, does not require cemeteries to be separated by any distance from private wells, perennial streams that flow into terminal reservoirs or terminal reservoirs.

22.     Virginia's Administrative Code Section 12VAC5-630-380 requires private wells to be separated from cemeteries, sewer lines, septic tanks, sewage drainfields and hog lots by 50 or 100 feet.

### B.     The Ordinance

23.     Prior to the changes adopted in response to AMAA's planned cemetery, the Stafford County Code looked very different as it pertained to cemeteries.  It did not include any setback requirements and imposed a minimum size requirement of 25 acres on perpetual care or endowed cemeteries.

24.     In April 2015, Stafford County considered and revised a portion of the then-existing ordinance to protect existing cemeteries from new development, which could disturb the cemetery land.  At that time, no changes were made to address groundwater safety related to cemeteries or to impose a zoning reclassification process on the establishment of non-churchyard cemeteries.  In fact, upon information and belief, the cemetery ordinance existing when AMAA purchased the Property largely had been in place for more than 30 years.

25.     The new Ordinance at issue provides, in relevant part, that "[n]o cemetery shall be established within the County unless authorized by an ordinance duly adopted by the Board, provided that authorization by ordinance shall not be required for interment of the dead in any churchyard or for interment of members of a family on private property."[1]

---

[1]  Stafford County Code Section 28-39(o), defined herein as the Ordinance, as updated and adopted by the County Board of Supervisors, is attached hereto as Exhibit A.

26.     The Ordinance, like Virginia law, prevents non-municipal cemeteries from being constructed within 900 feet of land housing a public well.

27.     The Ordinance departs from Virginia law, however, by extending that prohibition beyond public wells:

> No cemetery shall be established within 900 feet of any terminal reservoir or any perennial stream that drains into a terminal reservoir. No cemetery shall be located within 900 feet of any private well used as a drinking water supply.

28.     The Ordinance also requires that new cemeteries—except churchyard or family cemeteries on private property— must occupy land between 25 and 300 acres and submit to an Authorization Process for zoning reclassification.  The Authorization Process requires an application that "demonstrate[s] compliance with owner consent, setback and distance requirements" provided in the Stafford County Code.  Similarly, a site plan demonstrating such compliance is required.

29.     The Authorization Process also subjects the cemetery applicant to public hearings, notice of which shall be sent to owners of any property located within 900 feet of the proposed cemetery.  Typically, board hearings and approvals are not required to develop land in accordance with a use for which a property is zoned by right.

30.     The Authorization Process further permits the Board to "set conditions of approval [of the non-churchyard or private cemetery] to mitigate impacts of the cemetery and its accessory uses and activities."

### C.     Stafford County's Interpretation of "Churchyard"

31.     Although Stafford County's Code does not define the term "churchyard," the County has construed the term to *exclude* Muslim cemeteries, which, in the Islamic faith, are not built next to houses of worship.

32.     In or about August 2015, a Muslim group unaffiliated with AMAA, AsSalam Memorial Garden, LLC ("AMG"), sought to build a small Muslim cemetery in Stafford County. AMG's property was zoned for construction of a cemetery by right and AMG stated that it intended to use the property for religious burials.  The County refused to consider the group's cemetery as a "churchyard" and rejected it under then-existing Stafford County Code Section 8-18, which required that perpetual care and endowed cemeteries, as distinct from "churchyard" cemeteries, be a minimum of 25 acres.

33.     AMG argued that because Code of Virginia Section 57-26 did not impose a 25-acre minimum size requirement, Stafford County's arbitrary 25-acre minimum violated Virginia law by creating more restrictive size requirements.

34.     AMG also contended that the County should construe its proposed cemetery as a "churchyard," because

> [w]hile the common understanding of a 'churchyard' may be in reference to the specific property on which a church building is located, under the Muslim faith a cemetery cannot be co-located on the same property as a mosque.  A cemetery funded and operated by a mosque . . . is no less a 'churchyard' than a cemetery actually co-located on a parcel where a church building is located. ***To deny a Muslim mosque the same ability to establish a cemetery for its membership that is extended to Christian churches raises . . . constitutional issues that must be resolved in favor of established religious practices for any given faith.***

(emphasis added).  AMG attached a letter from its religious leader, which reiterated that "[t]he Muslim faith does not permit [c]emeteries to be co-located on the same property as a Mosque."

35.     Nonetheless, referencing both the Stafford County Code and Code of Virginia, the County responded that AMG's cemetery "does not qualify as a churchyard since there is no church located on the Property or associated with the Property on a directly abutting parcel." Following the County's actions, AMG did not establish a Muslim cemetery in Stafford County.

36.     The County adopted this narrow definition of "churchyard" despite knowledge of the disparate burden it imposed on Muslim cemeteries and the absence of a similar definition for "churchyard" in either Virginia or Stafford County regulations.

37.     Under Stafford County Code Chapter 28, Article 2, Section 28-25, when a term is not defined in the County Code, it is defined by reference to (1) the current edition of Webster's New Collegiate Dictionary by Merriam-Webster, Inc.; (2) Tracy Burrows, ed. A Survey of Zoning Definitions, American Planning Association, Planning Advisory Service Report No. 421 (1999); and (3) the current definition of Black's Law Dictionary.

38.     The current edition of Webster's New Collegiate Dictionary defines "churchyard" as "a yard which belongs to a church and which is often used as a burial ground."  That dictionary further defines "church" as, *inter alia*, "a body or organization of religious believers." Thus, the dictionary guidance, to which the County Code directs its readers, indicates that a "churchyard" is any burial ground owned by an organization of religious believers.  Neither the Burrows zoning book nor Black's Law Dictionary provide a definition for "churchyard."

39.     Ignoring the definition mandated by its own Code, the County has construed "churchyard" to mean cemeteries with a church on or adjacent to the property, with obvious implications for the ability of AMG and AMAA to exercise their religious freedoms.

II.     **AMAA'S RELIGIOUS MANDATE AND NEEDS**

**A.  AMAA Requires a Cemetery for Muslim Burials**

40.     AMAA was formed to fulfill the religious belief that all Muslims should have access to a burial consistent with Islamic rites and traditions.  The Islamic faith prescribes Muslims be buried next to other Muslims as soon as possible after an individual's death.

41.     AMAA provides affordable and necessary burial assistance, particularly for Muslims without nearby family or financial means to fulfill religious burial obligations on their own.

42.     Before AMAA established its first cemetery, there were no comparable Muslim cemeteries in Virginia and it was difficult, if not impossible, for many Muslims to be buried in accordance with their religious beliefs.

43.     In accordance with Muslim beliefs, bodies buried in AMAA's cemetery are cleansed and wrapped in a shroud of plain white cloth and, in some instances, placed in a wooden casket.  No embalming fluids are used.

44.     AMAA places the bodies in a PolyVault box.  Upon information and belief, the PolyVault boxes last nearly a century without deterioration and help ensure that minimal, if any, fluid seeps into the ground.

45.     As noted above, AMAA's board members, like many Muslims, sincerely believe that the Islamic faith prohibits Muslim cemeteries from being located adjacent to a mosque.  The County was aware of this at time it adopted the Ordinance.

46.     During burial, family members and a religious leader may be present to recite prayers.  Because gatherings are intentionally small, there is no formal funeral procession and thus no impact on traffic.

47.     Families and community members may visit the cemetery to supplicate to God on behalf of the deceased by quietly reciting prayers.  Plaintiff's religious traditions do not require large, organized, or loud prayers at a cemetery.

48.     In accordance with Islamic religious beliefs, the cemetery must be respected as a religious site and thus be properly cleaned and maintained.  For this reason, AMAA applies a portion of donations it receives to routine maintenance of the cemetery.

**B.  AMAA Purchases the Property with the Reasonable Expectation of Developing a Cemetery**

49.     In 1991, AMAA purchased a modest parcel of land on Brooke Road in Stafford County (the "Brooke Road Cemetery") and began using it as a Muslim cemetery in 1996. AMAA projects that the Brooke Road Cemetery will reach capacity in 2021.

50.     After an extensive search, AMAA identified the Garrisonville Road Property and considered it to be ideal as a new cemetery for several reasons.

51.     *First*, the Property is located in an A-1 zoning district, which allows cemeteries by right, a fact that AMAA confirmed directly with the County before making the purchase.  The Property complied with the applicable zoning laws governing cemeteries at the time. Additionally, AMAA obtained the requisite neighbor consents pursuant to the Code of Virginia and Stafford County Code, Chapter 8, Section 8-17.  AMAA's proposed cemetery would not be within 250 feet of the residence nor 200 feet of the private well of any other County resident.[2]

52.     *Second*, the topography of the Property is ideal for a cemetery.  The Property is flat and clear of trees, ready for immediate use.  Before purchase, AMAA engaged a consulting firm at a cost of several thousand dollars to prepare a geotechnical report, which confirmed that the land is suitable for use as a cemetery.

53.     *Third*, the Property is located near the existing Brooke Road Cemetery, making it easier for AMAA to manage both properties.

---

[2]  The Property itself contains private wells.  AMAA is prepared to take appropriate measures with respect to the wells on the Property, including keeping burials more than 100 feet from the wells consistent with the Virginia Department of Health advice.

54.     *Fourth*, the Property is adjacent to a state highway and thus is easily accessible to AMAA and community Muslims who wish to visit and offer prayers for their deceased loved ones.

55.     *Fifth*, the Property is sufficiently large to accommodate the community's growing needs and fulfill AMAA's charitable purpose.

56.     AMAA's proposed cemetery also would leave a 100-foot buffer from Resource Protection Areas, consistent with the Chesapeake Bay Preservation Act.  Compliance with this requirement would render only a negligible corner of the Property unusable as a cemetery.

57.     Satisfied with its due diligence, AMAA purchased the Property in May 2015. AMAA agreed to a purchase price of $800,000, half of which was paid at closing. The remaining portion was to be paid within two years.  Pursuant to the sale contract, AMAA agreed not to begin cemetery development until the land was fully paid off.

58.     AMAA purchased the Property, making all payments on the mortgage, in reliance on the County's designation of the Property in an A-1 zoning district, which authorizes cemeteries by right.  AMAA fully intended to comply with all applicable laws and regulations, including the Code of Virginia and the Stafford County Code.  AMAA did in fact comply with the Code of Virginia and the then-existing Stafford County cemetery ordinance.

### III.     THE COUNTY RESPONDS TO AMAA'S EFFORTS TO DEVELOP A MUSLIM CEMETERY ON THE PROPERTY

### A.  Community Member Complains of AMAA's Proposed Cemetery

59.     On June 9, 2016, David Silver, a Stafford County resident, emailed Board of Supervisors member Wendy Maurer stating that he had "heard about a cemetery that is going in across the street" and was "deeply concerned" about his private well.  Silver copied his neighbor,

then County Planning Commissioner Crystal Vanuch, on the email and inquired how the County intended to protect his water supply.

60.     Since 2013, Commissioner Vanuch has owned property across from the proposed cemetery, which appears to have a private well and serves as her residence and farm.  Vanuch never disclosed her residence or farm at any of the hearings to overhaul the County's cemetery ordinance.

61.     Supervisor Maurer replied to Mr. Silver, sympathizing with his concern and directing County staff to look into the issue and "get [Maurer] some background on this matter."

62.     The following day, in response to an inquiry by County staff, the Health Department advised that Virginia Private Well Regulations require 50 or 100 feet of separation between a private well and a cemetery and concluded, "[i]n [the Health Department's] *professional opinion and, according to the Regulations*, if there is at least 100 [feet] of separation between this existing bored well and the proposed cemetery, *there should be no public health problem created by a cemetery being installed."* (emphasis added).[3]

63.     The Health Department also reported that it had not been contacted by the resident.

64.     Staff reported to Maurer that the parcel in question was owned by a Muslim organization, AMAA.  Staff also relayed the Health Department's conclusion that there would be no public health risk from AMAA's development of a cemetery on the Property.

---

[3]  The Virginia Administrative Code Private Well Regulations provide that private wells, depending on the type, should only be permitted at least 50 or 100 feet from cemeteries, septic tanks, sewage drainfields or hog lots.  12VAC5-630-380.  The Code of Virginia, however, does not include any separation requirements from private wells or perennial streams in the provision governing the location of cemeteries.  Va. Code Ann. Sec. 57-26.

65.     Maurer forwarded the email to Vanuch, whom Maurer had appointed to the Planning Commission, writing "[n]ot sure about this answer."  Maurer did not specify the basis for her uncertainty.

66.     Moments later, Vanuch responded that "[t]his certainly doesn't address the constituents [sic] question."  Vanuch also reported that *already* she had identified other sources of water near the Property and that the County should get counsel involved and "see if we can send this regulation to the [P]lanning [C]omission."  Maurer concurred.  Neither Maurer nor Vanuch offered any basis for disagreeing with the conclusion of the Health Department or for why a property zoned for cemetery use by right might suddenly be viewed as unfit for that purpose.

67.     Soon after, Vanuch began inquiring about the scope of current cemeteries in the County, including those with church affiliations.  In response to these inquiries, County staff identified 35 "Church Cemeteries" and three "Perpetual Care Cemeteries."  AMAA's Brooke Road Cemetery is the only cemetery with a religious affiliation that is designated as a perpetual care cemetery and not as a church cemetery.

68.     County staff also provided information to Maurer and Vanuch regarding the "churchyard" exemption, explaining that "[a]ny new cemetery not part of a churchyard or that is not an internment of family members would be required to be authorized by the Board of Supervisors by adoption of an ordinance after a public hearing."  As such, Maurer and Vanuch confirmed and understood that AMAA's planned cemetery could be blocked by creation of an ordinance that imposed restrictive conditions that AMAA could not meet.

### B.  County Staff Prepares an Initial Draft of the Ordinance

69.     In or about September 2016, after consulting with Maurer and Vanuch, considering the input of the Health Department and referencing the Code of Virginia, the

County's Planning and Zoning Director prepared an early draft of a new cemetery ordinance (the "Draft Ordinance"), which included only a 100-foot setback from private wells.  This setback requirement—significantly less than the 900-foot setback ultimately required under the new Ordinance—was a less restrictive means of addressing any water safety concerns, to the extent legitimate, and could have been complied with by AMAA.

70.     Within minutes of receiving the Draft Ordinance, Maurer complained that it gave her "serious heartburn," and continued: "I don't care what the health department is willing to accept."  On information and belief, Maurer knew at the time that AMAA's proposed cemetery would be able to comply with the 100-foot requirement and, thus, the Draft Ordinance would not be sufficient to preclude AMAA from building the cemetery.

71.     County staff responded that it considered "the 100-foot separation from a private well as a defendable standard.  It is the maximum distance the Health Department requires." Staff added that the Code of Virginia does not have any separation requirement from private wells.

72.     Although Maurer did not care what the Health Department had to say in *this* instance, she separately chaired the County Community & Economic Development Committee (the "CED Committee"), which coordinated with the Health Department and authorized onsite soil evaluators to lessen restrictions within an onsite sewage disposal ordinance.  The CED Committee developed a proposal to reduce the requirements for onsite sewage disposal to bring them more in line with, instead of exceeding, Virginia regulations.  The changes were adopted in February 2017.

73.     Shortly thereafter Maurer's exchange with the staff, the Board referred the Draft Ordinance to the Planning Commission, authorizing it to make modifications it deemed appropriate or necessary.

74.     During a Planning Commission meeting on September 28, 2016, to discuss the Draft Ordinance, Commissioner Vanuch stated that there were "many considerations" to be had so she would like to create and chair a subcommittee (the "Subcommittee") to review the Draft Ordinance and propose changes.  Vanuch also asserted that there should be an "opportunity for constituents in the County to come to the meetings and engage and comment."  The Subcommittee was approved and Vanuch was appointed as its chairperson.  On information and belief, Vanuch did not, during this meeting, address the fact she had a personal interest in the Draft Ordinance or seek any guidance as to whether she should be recused.

### C.  Planning Commission Cemetery Subcommittee Creates the Ordinance

75.     Just days after Commissioner Vanuch took charge of the Subcommittee, the County circulated a new draft ordinance that imposed specific and more stringent requirements that singularly impact AMAA's development of a Muslim cemetery on the Property.  This new draft would ultimately become the Ordinance.

76.     Although Stafford County's prior cemetery ordinance did not require any setbacks from water sources, the Ordinance, in relevant part, prohibits: (i) a cemetery (except a municipal cemetery) within 900 feet of a public well on County property (consistent with the Code of Virginia); (ii) any cemetery within 900 feet of any terminal reservoir or any perennial stream that flows into terminal reservoirs; and (iii) any cemetery within 900 feet of a private well.  Existing cemeteries need not meet these setback requirements.

77.     The Ordinance includes a required 900-foot separation between cemeteries and terminal reservoirs or perennial streams that flow into terminal reservoirs notwithstanding that,

upon information and belief, water ultimately reaching a terminal reservoir is treated by the municipality.

78.     The setbacks exceed the Code of Virginia requirements and what the Health Department concluded is necessary with respect to private wells.  On information and belief, there is no public well near the Property, or in all of Stafford County.

79.     The 900-foot setbacks render the Property, which is uniquely shaped and situated between a purported perennial stream that flows into another creek that flows into a terminal reservoir, on one side, and private wells, on the other, unusable as a cemetery.

80.     Although the County implemented these setback requirements for cemeteries, it did not change setback requirements as to any other potential well contaminant.  Accordingly, consistent with the Virginia Administrative Code, only 50 or at most 100 feet of separation is required between private wells, on the one hand, and sewer systems, sewage drainfields, septic tanks, farms and hog lots, on the other hand.

81.     Vanuch also requested that the Ordinance prohibit the Board and Board of Zoning Appeals ("BZA") from granting any exemptions from the 900-foot setback requirement.  In making the request, Vanuch noted that a "cemetery (non church or family) has to go to the board, in what instance would they ever go to the BZA?"  The Planning Director assured her that while the Board possessed the "legislative prerogative" to change the setback requirements, to "make it difficult" for such changes to occur the Committee could "includ[e] the high moral purpose of the code," which he defined as "protect[ing] drinking water supplies from contamination caused by surface run-off and groundwater pollution due to cemeteries."  That "purpose" was included in the County record reflecting the vote in favor of the Ordinance.

82.     As noted above, subsections (a)(1) and (d) of the Ordinance also impose an Authorization Process on new cemeteries, but not on "churchyard" cemeteries.  The Authorization Process included in the Ordinance requires, for the first time, that non-churchyard and non-private family applicants may be subjected to public hearings, notice of which must "be sent to owners of any property located within 900 feet of the proposed cemetery."  The County does not construe Muslim cemeteries as "churchyards."

83.     Vanuch, whose property is within 900 feet of AMAA's proposed cemetery, suggested this requirement.  As a result, she must now be provided notification of development of a cemetery on the Property.

84.     The Authorization Process also provides that the Board may impose conditions on the subject cemeteries to mitigate the impact of the cemetery and its accessory uses and activities.  Churchyard and private cemeteries are not so limited.

### D.  Planning Commission Recommends that the Board Adopt the Ordinance

85.     At a November 9, 2016 Planning Commission meeting to approve the Ordinance, Vanuch—still silent as to the proximity between her farm and residence and the proposed cemetery—stated that the revised ordinance protects "our individual residents who get their primary source of water from their drinking wells . . . and farmers who graze their livestock or grow crops."

86.     Vanuch's concern for resident safety, however, did not apply to AMAA itself. During the drafting process, she contemplated exempting the private well located on the Property, asserting that it was okay "if they want to contaminate their own well."

87.     Vanuch also asserted that the Ordinance was "protecting religious liberties" by ensuring that the setbacks applied to *all* cemeteries (in reality, municipal cemeteries are

exempted from the 900-foot setback from public wells) and by exempting "churches" from the "extensive" and potentially costly and time-consuming Authorization Process:

> So, while we've done this we've also not required churches to go through a conditional use process and do ***extensive and potentially costly and timely soil studies that may not really even show the potential underground water table movements that could impact the spread of potential contaminants.*** So by adopting a universal setback requirement, ***it lowers the cost and burden to churches or new family cemeteries being created, and we have created the minimal burden for those wishing to establish these cemeteries[.]***

(emphasis added).

88.    AMAA's religious liberty is not protected or accounted for in the above statement or in any of the County's deliberations. While "churchyard" cemeteries are exempt from the Authorization Process, which County officials described as "extensive and potentially costly," Stafford County's actions indicate that AMAA's Muslim cemetery must comply with the Authorization Process.

89.    Mr. Silver, the original complaining County resident, provided the only public comment at the Planning Commission meeting, reiterating that "Stafford's primary goal should be to protect the citizens" and that "[y]ou do not want to have contaminated water like Flint, Michigan, and we have to do what we have to do[.]" He offered no explanation for why such contamination might occur or any basis for concluding that the Health Department had erred in determining that AMAA's proposed cemetery posed no public health risk.

90.    The Planning Commission accepted the Ordinance and sent it to the Board for review.

### E.  Board Hearing to Adopt the Ordinance

91.    The Board held a public hearing on December 13, 2016, to consider the Ordinance. Commissioner Vanuch led the presentation to the Board. On information and belief,

throughout the process of drafting and adopting the Ordinance, Vanuch never disclosed that her farm and residence were within 900 feet of the Property.

92.     Supervisor Jack Cavalier remarked that it "was totally out of normal order" for Vanuch, a junior Planning Commissioner, to brief the Board instead of County staff.  He noted that it "rarely, if ever, [has] been done, and I don't think that we were given the briefing that we probably deserved at that time."

93.     The documents submitted to the Board regarding the Ordinance contained limited and inaccurate information.  For example, the slide presentation to Board made no mention of groundwater safety, what had prompted concerns about groundwater safety, the impact of the Ordinance on AMAA, or the exemption for "churchyard" cemeteries from the onerous Authorization Process.  As Supervisor Cavalier later explained, the Board had not been "afforded the opportunity to make a really informed decision" before voting.

94.     Nonetheless, the Board of Supervisors voted to adopt the Ordinance.  There is no evidence in the public record that the County undertook to determine what the least restrictive means of addressing any water safety issue might be, the basis (or lack of basis) for the opinion of the Virginia Health Department, or any study into the underlying bases for the existing requirements under the Code of Virginia (which would have allowed, and still would allow, AMAA to build a cemetery on the Property).

95.     Even though it was AMAA's proposed cemetery development that prompted, and would be uniquely impacted by the Ordinance, at no point during the overhaul process did the County reach out to AMAA.

### IV.   UNAWARE OF THE NEW ORDINANCE, AMAA ATTEMPTS TO BEGIN CEMETERY DEVELOPMENT

96.     AMAA, unaware of the new Ordinance, continued to make payments on the Property.  In or about April 2017, AMAA made its final payment.

97.     AMAA visited County offices to begin the cemetery development process and was informed by County staff for the first time of the Ordinance and its impact on the Property. County officials went so far as to identify land use counsel to help AMAA understand its options.

98.     In or about August 2017, AMAA's counsel contacted the County regarding the Property.  The County informed AMAA's counsel of the Ordinance and that because of it, AMAA would have to follow the Authorization Process and satisfy its burdensome requirements.  In doing so, the County made clear that it did not consider AMAA's Muslim cemetery a "churchyard."

99.     The Department of Planning and Zoning also notified AMAA's counsel that "the [new] setback requirements might impact this site from being able to accommodate a cemetery" because a perennial stream on the edge of the site drains into another creek, which then drains into a terminal reservoir.  Therefore, the new setback requirements would preclude development on much of the Property.

100.    AMAA's counsel replied that this process sounded "onerous, and probably illegal, for a by right use."  He further explained that while AMAA had "no choice but to go through the process if that is the interpretation," the Authorization Process imposed "significant legal conflict . . . particularly since this is to be a Muslim cemetery."

101.    Over the next two years, as the impact of the Ordinance on the Property became clear, AMAA continuously petitioned the County to revise its Ordinance and impose a less

restrictive version that would allow it to establish its much-needed Muslim cemetery. The County steadfastly refused.

### A. AMAA Seeks Reconsideration of the Ordinance

102.    On September 19, 2017, at a County Board of Supervisors meeting, AMAA Board Member Aftabjan Khan spoke about the Ordinance's impact on AMAA. He explained that before purchasing the Property, AMAA confirmed that it was zoned for cemetery development by right. But, because of the Ordinance, AMAA could no longer use the Property as it had reasonably expected. He requested that the County reduce the onerous burdens. The Board agreed to refer the Ordinance back to the Planning Commission for review and reconsideration.

103.    At the following Planning Commission meeting on November 15, 2017, AMAA Board Member Sikander Javed spoke about AMAA's need to use the Property as a cemetery. He requested that AMAA board members be able to share their expertise on how they handle burials; that the Commission appoint "disinterested" members to serve on the Subcommittee; and that AMAA receive advance notice of any meetings so that it could participate. Mr. Javed also noted that no neighboring jurisdictions imposed the excessive setbacks Stafford County now requires nor do the Health Department or Chesapeake Bay Preservation Act require such extreme setbacks.

104.    Two of Commissioner Vanuch's neighbors who reside across the road from the Property spoke in opposition to AMAA, noting that their concerns about AMAA's intent to build a cemetery "kick-started the review process which resulted in [the Ordinance] being enacted." They also asserted that "[a] suspicious person might think [AMAA was] trying to fly under the radar to present the[] cemetery as a fait accompli."

105.    After these comments, the Planning Commission reappointed the same Subcommittee—including Commissioner Vanuch—to decide whether to revise the Ordinance.

106.    Concerned about this unusual process, AMAA submitted a complaint to the Commonwealth Attorney of Stafford County.  AMAA requested an investigation into Vanuch's role in developing the Ordinance, explaining how her property "directly benefits" from the changes and that under Virginia law, her participation raised a conflict of interest.

107.    Nonetheless, Vanuch continued to lead the Subcommittee and served as chairperson as it decided whether to revise the Ordinance.

108.    While the investigation into Vanuch's conflict was pending, the Planning Commission held a special meeting on December 6, 2017.  Vanuch's neighbors, Mr. Silver and Mr. Patterson, again spoke against the cemetery, citing groundwater concerns and the marketability of their homes.  The Planning Commission again delayed taking any action.

109.    At the beginning of the Planning Commission's next hearing on January 17, 2018, Vanuch reported, as Chairperson of the Subcommittee, that the Subcommittee had no agenda, had not conducted any meetings, and had not scheduled any meetings.

110.    At the next full Planning Commission meeting on May 9, 2018, AMAA again urged the Planning Commission to review the Ordinance.

111.    The Planning Commission staff then delivered a report, based on the Subcommittee's findings, to the full Planning Commission, which recommended no changes to the Ordinance.  The Planning Commission delayed its vote until its next meeting.

**B.  Planning Commission Recommends Affirming the Ordinance**

112.    On May 23, 2018, eight months after AMAA implored the County to reconsider the Ordinance, the Planning Commission finally met to consider the issue.

113.    The Planning Commission heard public comments on revisions to the Ordinance. A man identifying himself as residing in the district of the proposed AMAA cemetery stated that he had a petition with over 100 signatures of residents who were "firmly opposed" to modifying the Ordinance.

114.    The Planning Commissioners then questioned County staff.  Commissioner Apicella tried to get staff to confirm that the Ordinance treats "secular and non-secular entities" in the same manner.  When staff refused to answer, the Planning and Zoning Director interjected that there was no different treatment "with the exception [that] the County has adopted the State standard that speaks to churchyard cemeteries not having to go through the zoning [Authorization Process] by the Board of Supervisors."  Notably omitted was the fact that Stafford County had consistently construed "churchyard" to exclude Muslim cemeteries while including Christian ones.

115.    Following this presentation, the Planning Commission voted to affirm the Ordinance and send the matter to the full Board of Supervisors for a public hearing and vote.

### C.  Board of Supervisors Votes to Keep the Ordinance

116.    Before voting on the Ordinance, the Board held an additional meeting on August 21, 2018, the same date as Eid al-Adha, a Muslim religious holiday that precluded AMAA representatives from attending.

117.    At that hearing, County residents pressed the Board to uphold the Ordinance, claiming without support that it protected against "documented health hazards."  At least one resident threatened legal action if the Ordinance was changed.

118.    On September 18, 2018, the Board considered whether to revise the Ordinance. They were presented with three options:

Option 1:  "Do nothing" and leave the Ordinance in full effect;

Option 2:  A "middle" option whereby the Board could require a conditional use permit and make a site-specific evaluation as to whether an applicant should receive some form of relief from the 900-foot setbacks; or

Option 3:  Continue allowing cemeteries by right and remove the Ordinance provisions that exceed state law, such as the minimum 25-acre requirement and the 900-foot setbacks from private water supplies, perennial streams and terminal reservoirs.

119.     Instead of adopting Option 2 or 3, the Board voted to uphold the most restrictive Option 1 and to retain the Ordinance in full.  In doing so, the Board, led by Supervisor Maurer, engaged in an unusual and incendiary discussion specifically targeting AMAA.

120.     Maurer repeatedly stated incorrectly that AMAA's proposed cemetery threatened the water supply because AMAA would be burying "embalming fluid, mercury from medical devices, and arsenic from caskets."

121.     Maurer once again dismissed the Health Department's assessment.  She alleged that the Health Department advice ignored water issues such as those in "Flint, Michigan" and the "poisoning of thousands of men, women, and children at Camp Lejeune from contaminated ground water," including a "dear friend" of Maurer's whom she said had died from cancer. Nothing in the County record, however, provided support for any connection between AMAA's proposed cemetery and the alleged contamination issues in Flint or Camp Lejeune, or any reasoned basis for challenging the Health Department's conclusion.

122.     Another Board member also asserted that if they proceeded on Options 2 or 3, the Board would be telling County residents on private wells that they "were deserving of water quality lower than third world nations."

123.     Other members of the Board repeatedly tried to interrupt and point out that Supervisor Maurer's comments were beyond the scope of the issues before them.  Maurer carried on, asserting that she was "passionate" about the subject.

124.    Maurer also insisted, for the first time and incorrectly, that AMAA's cemetery would create traffic problems because of funeral processions.  Islamic funerals, however, do not typically involve a lengthy processions of cars.

125.    Maurer claimed without support that the less-restrictive Options 2 and 3 would result in cemeteries being located "next to a school," "business parks like around the airport," and "in the middle of the newly envisioned 'Downtown Stafford.'"  Mauer did not mention, however, that to build a cemetery in Stafford County, the land at issue must first be zoned for that purpose and requisite neighbor consents must be obtained.  Nor did Mauer or anyone else explain why such problems had not occurred under the pre-Ordinance regime, in which no setbacks of any kind were required by the County.

126.    At the end of her remarks, Maurer pushed for a vote, stating that she was going to end this "painful process" and affirm the Ordinance.

127.    Other members of the Board tried to postpone the vote, asking for more time to think and discuss before voting, and noting that an absent member had asked for a deferral so that he could participate.  Maurer pushed ahead and a motion to defer ended in a tie and failed.

128.    Maurer carried on, stating that she would continue speaking because "she was passionate on this issue and had a lot to say in support of her motion; and the Bylaws did not restrict her time."  Maurer made clear she was particularly focused on the Ordinance's impact on AMAA, attacking it repeatedly and claiming incorrectly that AMAA could have "easily used" the Brooke Road Cemetery but had chosen not to.

129.    Supervisor Cavalier responded that he could not support Supervisor Maurer's motion, explaining that the Board had not been "afforded the ability to make a really informed

decision" about the Ordinance due to the deficiency of Commissioner Vanuch's briefing during the December 2016 Board meeting.

130.     Nonetheless, at Maurer's insistence the Board voted on the Ordinance.  By a vote of 3-2, the Board voted in favor of the most restrictive option before it:  upholding the Ordinance in full.

131.     Following the hearing, Chairperson Bohmke stated, "It was not a very fun night for any of us."  She added: "It was all very uncomfortable.  I did not even know what was going to be said until about 15 or 20 minutes before the meeting."  In particular, she considered whether as Chairperson she could shut down Supervisor Maurer during the hearing.

132.     Supervisor Cavalier further described the hearing and ultimate vote as a "sham" and stated that "[b]oth current and former supervisors have told me they have never seen such a spectacle."

## V.    COUNTY DENIES AMAA'S REQUEST FOR A VARIANCE

133.     On December 21, 2018, AMAA requested a variance from the Board of Zoning Appeals.  AMAA's variance application confirmed that the proposed cemetery complied with (1) Virginia Department of Health recommendations; (2) the Chesapeake Bay Preservation Act; (3) Virginia consent requirements; (4) Virginia setback requirements; and (5) would not be within 250 feet of any residence across the street or within 200 feet of any private well across the street. In addition, AMAA submitted a design plan and the requisite variance application fee.

134.     AMAA also attached to its variance application an affidavit from a Master Level Site Evaluator with more than thirty years of experience.  The Evaluator concluded that state regulations "provide more than sufficient protection from decomposition following burials."  In addition, her affidavit provides that the County's 900-foot setbacks are "superfluous" and "serve no public purpose."

135.    The Evaluator's affidavit also states that "[t]here is significantly less impact to soils and subsurface water quality from body decomposition (whether in private wells, public sources of drinking water, soils, or perennial streams) than impact from septic systems."  As noted above, on information and belief, the County has taken no comparable action to impose setbacks between septic systems and private wells.

136.    AMAA's variance application was met with strong, coordinated opposition. Community members made inflammatory and unsubstantiated allegations, including that AMAA planned to bury up to "100,000 bodies" and that doing so could result in children dying from cancer.  The County did not correct the misstatements about AMAA or the proposed cemetery, which contemplates approximately 15,000 burials.

137.    In written submissions and at the hearing, AMAA demonstrated compliance with each of the factors required for a variance and again explained that because of its religious beliefs, it could not establish its cemetery next to a house of worship.

138.    On January 2019, AMAA received a lengthy, two-part report from the BZA staff (the "BZA Response"), which recommended a full denial of the variance application.  The BZA Response disregarded most of AMAA's points and raised several issues beyond the scope of consideration in a variance application.  Although AMAA submitted a supplemental justification on February 12, 2019, addressing each of the items in the BZA Response, BZA reissued its original response verbatim without change, again recommending a full denial.

139.    On February 26, 2019, the BZA held a hearing on AMAA's application.  Seven voting members of the BZA were present, including Steven Apicella, who also served as Vice Chairperson of the Planning Commission.

140.    Several aspects of the three-hour hearing were unusual, including that the BZA combatively questioned AMAA's land use counsel; read the determination from a lengthy pre-written statement; failed to acknowledge any of the points AMAA made as to why it satisfied each of the requisite variance factors; and appeared to impose on AMAA a number of requirements that were not necessary to obtain a variance, including:

- Conducting an environmental site assessment under the Chesapeake Bay Compliance Plan;

- Submission of a site plan, even though AMAA explained any such submission was futile without first receiving a variance;

- A demonstration that AMAA has a "vested" right in the land;

- A more burdensome standard of proof for a variance than required for other applicants;

- Requiring consent forms from property owners beyond those encompassed even by the Ordinance.

141.    The hearing also included a robust and coordinated opposition to AMAA's request from nearby residents, including at least one who prepared and delivered a PowerPoint presentation.  The residents made incendiary and inaccurate statements about purported safety concerns related to AMAA's proposed cemetery, including that AMAA would "stack[] up to a thousand bodies per acre, double that if they stack couples;" the "leeching embalming chemicals and decomposing human remains;" and the "noise."

142.    The BZA voted unanimously to deny AMAA's variance application.

143.    As a direct result of the County's actions, including its implementation and enforcement of the Ordinance, AMAA cannot build its by right cemetery on the Property. Further proceedings before any agency of the County would be futile.

144.   AMAA's existing cemetery is nearing capacity; as each day passes its need for a cemetery on the Property increases.

145.   Due to these delays and lack of approval of the proposed cemetery, AMAA has been forced to develop previously unusable portions of Brooke Road Cemetery at great expense to accommodate additional burials, pay real-estate taxes on the Property as it is ineligible for tax-exempt status without a cemetery, and has incurred financial losses, including fees for engineering reports.  In addition, AMAA has lost donations and sales of its burial certificates which guarantee burial in an AMAA cemetery.

146.   The Defendants' discriminatory blocking of AMAA's proposed cemetery severely inhibits its ability to fully and freely practice the Islamic faith.  AMAA's cemetery would not have been prevented but for its religious affiliation.

147.   Further, the Defendants' refusal to allow AMAA to establish its cemetery by right places substantial pressure on AMAA to modify its intention to build a much-needed cemetery in Stafford County, and upon Muslims in the community to forego their traditional Islamic burial practices.

148.   Upon information and belief, discovery will reveal a community and County animus towards AMAA because it carries out religious beliefs and practices of the Islamic faith.

149.   On March 17, 2020, the Board initiated proposed amendments to the Ordinance. It is unclear what the intended effect will be of such amendments, if passed.  AMAA has inquired into the nature of the proposed amendments in relation to AMAA's proposed Muslim cemetery.  To date, the County has not provided any substantive response to these questions other than to invite AMAA's continued participation in public hearings.

## VI.     THE COUNTY TREATS CHRISTIAN ORGANIZATIONS MORE FAVORABLY

150.    In contrast to the County's treatment of AMAA (and AMG before it), the Board has readily made exceptions or rewritten the County Code to facilitate the requests of Christian organizations in Stafford County.  Between 2007 and 2017, Stafford County accommodated the zoning requests of at least three Christian churches that did not comply with the Stafford County zoning code.

151.    In each instance, the County provided permits or altered its ordinance to facilitate Christian organizations satisfying their religious needs.  Specifically:

- In 2007, the Board approved a Conditional Use Permit allowing Mount Ararat Baptist Church to increase its building height.  The BZA then provided a special exception so the church was not required to meet the open space requirements on three tracts of its property.

- In response to a request from the Aquia Episcopal Church in 2012, the Board amended a county ordinance to remove the conditional use permit requirement typically needed before altering or constructing on a historical property.

- In 2017, the Board removed zoning restrictions imposed on Ebenezer United Methodist Church by relaxing the minimum acreage requirements and removing its distance buffer.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violation of the Religious Land Use and Institutionalized Persons Act of 2000**
**42 U.S.C. § 2000cc(a) – Substantial Burden**
**(Against All Defendants)**

152.    RLUIPA prohibits any government from imposing or implementing land use regulations in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution furthers a compelling governmental interest and is the least restrictive means of furthering that interest.

153.     As stated herein, Defendants have deprived and continue to deprive AMAA of its right to free exercise of religion, as provided in RLUIPA, by imposing and implementing an Ordinance that places a substantial burden on its religious exercise without a compelling governmental interest and without using the least restrictive means of achieving such interest.

154.     Defendants imposed the substantial burden on AMAA in the implementation of a system of land use regulations under which a government makes, or has in place, procedures or practices that permit the government to make individualized assessments of proposed uses for property.

155.     AMAA has suffered damages as a result of Defendants' improper actions in violation of RLUIPA.

156.     AMAA is entitled to declaratory and injunctive relief and to damages.

**SECOND CAUSE OF ACTION**
**Violation of the Religious Land Use and Institutionalized Persons Act of 2000**
**42 U.S.C. § 2000cc(b)(2) – Non-Discrimination**
**(Against All Defendants)**

157.     RLUIPA prohibits any government from imposing or implementing land use regulations in a manner that discriminates against any assembly or institution on the basis of religion or religious denomination.

158.     As stated herein, Defendants have violated RLUIPA by implementing land use regulations in a manner that intentionally discriminates against AMAA on the basis of sincerely held religious beliefs.  Among other things, Defendants have engaged in a highly unusual process that resulted in the discriminatory and arbitrary implementation and enforcement of the Ordinance.  Under the Ordinance, Defendants (i) imposed setbacks on AMAA's property to deny it the ability to build a Muslim cemetery on the Property and (ii) intentionally subjected Muslim applicants, including AMAA, to the Authorization Process and minimum acreage requirement,

32

while exempting "churchyards" from the same.  Such actions violate the nondiscrimination provision of RLUIPA.

159.    The Defendants' actions in adopting the Ordinance were arbitrary and capricious and deprive AMAA of its constitutionally protected interests.

160.    The reasons advanced by Defendants for adopting the cemetery Ordinance, including the most restrictive (rather than the least restrictive) contemplated setback requirements, were pretextual.  Defendants commissioned no relevant studies and articulated no basis for questioning the Health Department's professional conclusion that AMAA's proposed cemetery posed no public health risk.  In fact, the record confirms that County staff concluded that a 100-foot setback was sufficient and included this requirement in an initial draft ordinance, only to be overruled by the Planning Commission and the Board.  The absence of any public safety concern was also confirmed in an expert analysis provided to the BZA in support of AMAA's variance application.  Moreover, despite purported water safety concerns in this case, Defendants have been more lenient in regulating distances between private wells and other potential sources of contamination, including septic tanks, sewage drainfields, farms and hog lots.

161.    AMAA has suffered damages as a result of Defendants' unlawful actions.

162.    AMAA is entitled to declaratory and injunctive relief and to damages.

**THIRD CAUSE OF ACTION**
**Violation of the United States Constitution**
**Equal Protection: Fourteenth Amendment**
**42 U.S.C. § 1983**
**(Against All Defendants)**

163.    The Fourteenth Amendment of the United States Constitution provides that no

state shall "deny to any person within its jurisdiction the equal protection of the laws" (the

"Equal Protection Clause").

164.    As stated herein, Defendants have violated and continue to violate AMAA's

rights under the Equal Protection Clause by intentionally treating AMAA differently from other

entities on the basis of religion.  Defendants' actions were undertaken under color of law of the

Commonwealth of Virginia, and Stafford County ordinance and procedures.

165.    The Defendants' actions in adopting the Ordinance were arbitrary and capricious

and deprive AMAA of its constitutionally protected interests.

166.    The reasons advanced by Defendants for adopting the cemetery Ordinance,

including the most restrictive (rather than the least restrictive) contemplated setback

requirements, were pretextual.  Defendants commissioned no relevant studies and articulated no

basis for questioning the Health Department's professional conclusion that AMAA's proposed

cemetery posed no public health risk.  In fact, the record confirms that County staff concluded

that a 100-foot setback was sufficient and included this requirement in an initial draft ordinance,

only to be overruled by the Planning Commission and the Board.  The absence of any public

safety concern was also confirmed in an expert analysis provided to the BZA in support of

AMAA's variance application.  Moreover, despite purported water safety concerns in this case,

Defendants have been more lenient in regulating distances between private wells and other

potential sources of contamination, including septic tanks, sewage drainfields, farms and hog

lots.

167.    AMAA has suffered constitutional and economic injuries as a result of

Defendants' actions.

168.    AMAA is entitled to a declaratory judgment that Defendants' conduct has

violated its Fourteenth Amendment rights.

169.    AMAA is also entitled to injunctive relief mandating that AMAA's variance

application be granted forthwith and that it not be subject to the Authorization Process, and to

damages.

**FOURTH CAUSE OF ACTION**
**Violation of the United States Constitution**
**Establishment Clause: First and Fourteenth Amendments**
**42 U.S.C. § 1983**
**(Against All Defendants)**

170.    The First Amendment of the United States Constitution, as incorporated through

the Fourteenth Amendment, prohibits a state or any political subdivision thereof from making

any law establishing any religion or fostering excessive government entanglement with religion

(the "Establishment Clause").

171.    As stated herein, in engaging in the acts described above, Defendants were acting

under color of law of the Commonwealth of Virginia and Stafford County ordinance and

procedures.

172.    The Ordinance violates the Establishment Clause both on its face and as applied.

The Ordinance favors, or establishes, selected religious cemeteries that satisfy Defendants'

definition of "churchyard," by exempting them from ordinance and size requirements.  The

Ordinance disfavors Muslim cemeteries by not allowing them to benefit from the exemption and

subjecting them to costly and onerous ordinance process and size requirements that are not applied to "churchyard" cemeteries.

173.    To determine whether a cemetery is a "churchyard" cemetery the County undertakes an individualized analysis of the religious practices of the cemetery applicant and whether it has an adjoining "church."

174.    A substantial burden has been imposed by the discriminatory and arbitrary Ordinance, on its face and as applied to AMAA.

175.    AMAA has suffered injury as a result of the illegal and unconstitutional actions of Defendants.

176.    AMAA is entitled to a declaratory judgment that the Defendants' conduct has violated its First and Fourteenth Amendment rights.

177.    AMAA is entitled to injunctive relief and to damages.

**FIFTH CAUSE OF ACTION**
**Violation of the United States Constitution**
**Procedural Due Process: Fourteenth Amendment**
**42 U.S.C. § 1983**

178.    The Due Process Clause of the Fourteenth Amendment prohibits statutes that are so vague as to fail to provide people of ordinary intelligence a reasonable opportunity to understand the conduct governed by the statute as well as statutes that authorize or encourage arbitrary and discriminatory enforcement.  Further, under Supreme Court precedent interpreting the Due Process Clause, statutes must provide explicit standards for those who apply them to avoid resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

179.    The Ordinance violates the Due Process Clause of the Fourteenth Amendment. The constitutional flaws in the Ordinance resulted in an arbitrary and discriminatory application

with respect to AMAA.  Specifically, the Board defined "churchyard" narrowly to discriminate against Stafford County's Muslim community by subjecting it to burdensome requirements, such as the Authorization Process.  In engaging in the acts described above, Defendants were acting under color of state law.

180.    AMAA is entitled to a declaratory judgment that the Ordinance violates the Due Process Clause of the Fourteenth Amendment.

**SIXTH CAUSE OF ACTION**
**Violation of the United States Constitution**
**Substantive Due Process: Fourteenth Amendment**
**42 U.S.C. § 1983**
**(Against All Defendants)**

181.    The Due Process Clause of the Fourteenth Amendment prohibits any state from depriving any person of life, liberty or property without due process of law.

182.    AMAA has a constitutionally protected interest in its use of the Property zoned for cemetery use by right and which, at the time of purchase, was not subject to the new onerous cemetery Ordinance.  AMAA also has a constitutionally protected interest in exercising its religious liberties.

183.    The Defendants' actions in adopting the Ordinance were arbitrary and capricious and deprive AMAA of its constitutionally protected interests.

184.    The reasons advanced by Defendants for adopting the cemetery Ordinance, including the most restrictive (rather than the least restrictive) contemplated setback requirements, were pretextual.  Defendants commissioned no relevant studies and articulated no basis for questioning the Health Department's professional conclusion that AMAA's proposed cemetery posed no public health risk.  In fact, the record confirms that County staff concluded that a 100-foot setback was sufficient and included this requirement in an initial draft ordinance,

only to be overruled by the Planning Commission and the Board.  The absence of any of public

safety concern was also confirmed in an expert analysis provided to the BZA in support of

AMAA's variance application.  Moreover, despite purported water safety concerns in this case,

Defendants have been more lenient in regulating distances between private wells and other

potential sources of contamination, including septic tanks, sewage drainfields, farms and hog

lots.

185.    AMAA is entitled to a declaratory judgment that the Ordinance violates the Due

Process Clause of the Fourteenth Amendment.

**SEVENTH CAUSE OF ACTION**
**Violation of the Constitution of the**
**Commonwealth of Virginia, Article 1, Section 16**
**(Against All Defendants)**

186.    The Virginia Constitution, Article 1, Section 16 states that

> the General Assembly shall not prescribe any religious test
> whatever, or confer any peculiar privileges or advantages
> on any sect or denomination, or pass any law requiring or
> authorizing any religious society, or the people of any
> district within this Commonwealth, to levy on themselves
> or others, any tax for the erection or repair of any house of
> public worship, or for the support of any church or
> ministry; but it shall be left free to every person to select
> his religious instructor, and to make for his support such
> private contract as he shall please.

187.    As stated herein, Defendants' actions have violated and continue to violate

AMAA's rights under the Virginia Constitution by intentionally discriminating against AMAA

on the basis of religious belief.  By granting exemptions to cemeteries that are located on or

associated with "churchyards," Defendants conferred peculiar privilege upon certain religions,

but not on AMAA.

188.    Defendants have discriminated against AMAA by adopting and applying the burdensome cemetery Ordinance based on discriminatory animus towards AMAA's religion. AMAA has been directly and proximately injured as a result of Defendants' illegal actions.

189.    The Defendants' actions in adopting the Ordinance were arbitrary and capricious and deprive AMAA of its constitutionally protected interests.

190.    The reasons advanced by Defendants for adopting the cemetery Ordinance, including the most restrictive (rather than the least restrictive) contemplated setback requirements, were pretextual.  Defendants commissioned no relevant studies and articulated no basis for questioning the Health Department's professional conclusion that AMAA's proposed cemetery posed no public health risk.  In fact, the record confirms that County staff concluded that a 100-foot setback was sufficient and included this requirement in an initial draft ordinance, only to be overruled by the Planning Commission and the Board.  The absence of any public safety concern was also confirmed in an expert analysis provided to the BZA in support of AMAA's variance application.  Moreover, despite purported water safety concerns in this case, Defendants have been more lenient in regulating distances between private wells and other potential sources of contamination, including septic tanks, sewage drainfields, farms and hog lots.

191.    AMAA has suffered constitutional and economic injuries as a result of Defendants' actions.

192.    AMAA is entitled to a declaratory judgment that the Defendants' conduct has violated Article 1, Section 16 of the Virginia Constitution, and to damages.

## EIGHTH CAUSE OF ACTION
### Violation of the Constitution of the
### Commonwealth of Virginia, Article 1, Section 11
### (Against All Defendants)

193.    The Virginia Constitution, Article 1, Section 11 states that

> no person shall be deprived of his life, liberty, or property
> without due process of law; that the General Assembly
> shall not pass any law impairing the obligation of contracts;
> and that the right to be free from any governmental
> discrimination upon the basis of religious conviction, race,
> color, sex, or national origin shall not be abridged . . .

194.    The Defendants' actions in adopting the Ordinance were arbitrary and capricious and deprive AMAA of its constitutionally protected interests.

195.    The reasons advanced by Defendants for adopting the cemetery Ordinance, including the most restrictive (rather than the least restrictive) contemplated setback requirements, were pretextual.  Defendants commissioned no relevant studies and articulated no basis for questioning the Health Department's professional conclusion that AMAA's proposed cemetery posed no public health risk.  In fact, the record confirms that County staff concluded that a 100-foot setback was sufficient and included this requirement in an initial draft ordinance, only to be overruled by the Planning Commission and the Board.  The absence of any of public safety concern was also confirmed in an expert analysis provided to the BZA in support of AMAA's variance application.  Moreover, despite purported water safety concerns in this case, Defendants have been more lenient in regulating distances between private wells and other potential sources of contamination, including septic tanks, sewage drainfields, farms and hog lots.

196.    AMAA is entitled to a declaratory judgment that the Defendants' conduct has violated Article 1, Section 11 of the Virginia Constitution, and to damages.

## NINTH CAUSE OF ACTION
### Violation of Dillon's Rule
### (Against All Defendants)

197.    The powers of local governments in Virginia are subject to the Dillon Rule, which

provides that "municipal corporations have only those powers that are expressly granted, those

necessarily or fairly implied from expressly granted powers, and those that are essential and

indispensable.  When a local ordinance exceeds the scope of this authority, the ordinance is

invalid."  *City of Chesapeake v. Gardner Enters.*, 482 S.E.2d 812, 814 (Va. 1997).

198.    The Ordinance exceeds the scope of the Defendants' authority and is therefore

*ultra vires* and void.

199.    Code of Virginia Section 57-26 governs the establishment of cemeteries in

Virginia.  In relevant part, that statute (i) requires 900 feet of separation between municipal land

with a public well and a cemetery, except a municipal cemetery and (ii) exempts "churchyard"

and family cemeteries on private property from an ordinance requirement.

200.    The Ordinance exceeds each of these requirements without the Defendants having

any express or implied authority to do so.

201.    First, the Ordinance exempts "churchyard" and family cemeteries on private

property from the Authorization Process.  Nothing in the Code of Virginia or from the General

Assembly has explicitly or implicitly limited the term "churchyard" as only including cemeteries

adjacent to churches.  Because Defendants arbitrarily construe "churchyard" as excluding

Muslim cemeteries, AMAA is subject to the Authorization Process from which the Code of

Virginia sought to exempt religious cemeteries.

202.    Second, the Ordinance imposes a 900-foot setback between any cemetery,

including churchyard and private family cemeteries, and (i) any terminal reservoir or perennial

stream that flows into terminal reservoirs and (ii) any private well.  These restrictive setbacks have prevented AMAA from using the Property for a religious cemetery.

203.    As such, each of these provisions of the Ordinance are *ultra vires* and void.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court enter judgment in its favor and enter an order:

i.      declaring that Defendants' actions, as alleged herein, violated RLUIPA, the United States Constitution, the Virginia Constitution and Virginia's Dillon Rule;

ii.     declaring that the Ordinance is invalid and unconstitutional under the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

iii.    declaring that the Ordinance is invalid and unconstitutional under Article 1, Section 11 of the Virginia Constitution;

iv.     declaring as *ultra vires* and void the portions of the Ordinance that exceed state requirements, including the 900-foot setbacks from private wells and terminal reservoirs or any perennial stream that flows into terminal reservoirs; the 25-acre minimum requirement; and the exclusion of Muslim cemeteries from being considered "churchyard" cemeteries;

v.      enjoining Defendants, together with their officers, employees, agents, successors and all other persons in concert or participation with them, from unlawfully burdening the religious exercise of Plaintiff or discriminating against Plaintiff on the basis of religion or religious denomination;

vi.     mandating training for each and every one of Defendants' officials and agents engaged in the implementation of land use regulations as to the requirements and obligations imposed on state and municipal actors by RLUIPA, the United States Constitution, and the Virginia Constitution;

vii.    requiring that Defendant, its officers, employees, agents, successors and all other persons in concert or participation with it to take such actions as may be necessary to restore, as nearly as practicable, Plaintiff to the position it would have been in but for Defendant's unlawful conduct, including but not limited to adopting an ordinance that will authorize Plaintiff to use the Property as a Muslim cemetery;

viii.  awarding compensatory damages in an amount to be determined at trial, together with Plaintiff's costs and disbursements in this action;

ix.  awarding reasonable attorneys' fees under 42 U.S.C. § 1988 in an amount to be determined by the Court; and

x.  awarding such other further relief as the Court may deem just and appropriate.

Dated:  June 8, 2020

Respectfully submitted,

 /s/  Hassan M. Ahmad

Hassan M. Ahmad (VSB 83428)
**The HMA Law Firm**
8133 Leesburg Pike, #801
Vienna, VA 22182
Telephone:  703-964-0245
Facsimile:  703-997-8556
hma@hmalegal.com

Nabihah Maqbool *
**MUSLIM ADVOCATES**
P.O. Box 34440
Washington, DC 20043
Telephone:  202-900-7381
Facsimile:  202-508-1007
Nabihah@muslimadvocates.org

Tawfiq S. Rangwala *
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001-2163
Telephone:  212-530-5000
Facsimile:  212-530-5219
trangwala@milbank.com

Melanie Westover Yanez *
**MILBANK LLP**
1850 K Street NW, Suite 1100
Washington, DC 20006
Telephone:  202-835-7500
Facsimile:  202-263-7586
mwyanez@milbank.com

*Counsel for Plaintiff*
*\* - pro hac vice forthcoming*